UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
BARBARA BOWEN AND LORRAINE COHEN,                    :
                                    Plaintiffs,      :
                                                     :
            - V -                                    :
                                                     :
MATTHEW GOLDSTEIN IN HIS OFFICIAL CAPACITY AS        :
THE CHANCELLOR OF THE CITY UNIVERSITY OF NEW         :  07 CV 10997
YORK, GAIL MELLOW, IN HER OFFICIAL CAPACITY AS       :     (RMB)
PRESIDENT OF LAGUARDIA COMMUNITY COLLEGE,            :
AND FREDERICK SCHAFFER, IN HIS OFFICIAL CAPACITY     :
AS VICE CHANCELLOR FOR LEGAL AFFAIRS OF THE          :
CITY UNIVERSITY OF NEW YORK,                         :
                                    Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## DECLARATION OF FREDERICK P. SCHAFFER

FREDERICK P. SCHAFFER declares pursuant to 28 U.S.C. §1746:

1.      I am General Counsel and Senior Vice Chancellor for Legal

Affairs of The City University of New York ("CUNY" or "University").

2.      I submit this declaration in opposition to Plaintiffs' motion for a

preliminary injunction.  Plaintiffs contend that CUNY and LaGuardia Community

College, one of its educational units, are violating their First Amendment rights by

denying their union, the Professional Staff Congress/CUNY ("PSC"), access to CUNY's

email system for the purpose of conducting union business.  There is absolutely no

support in the law for this claim.  The PSC may seek such access through collective

bargaining, as it has done successfully in the past with respect to its use of college

meeting space, mailroom facilities and bulletin boards.  The provisions granting the PSC

access to those facilities are set forth in Article 7 of the Collective Bargaining Agreement (Exhibit 1) and have been in effect for many years. However, the PSC has pointedly refused to bargain about access to CUNY's computer resources and instead seeks to obtain it from this Court by invoking spurious constitutional claims.

Background to CUNY's Policy on Acceptable Computer Use

        3.      CUNY is a public university established under the New York State Education Law. Pursuant to Education Law § 6206, CUNY is governed by a Board of Trustees, which has full and complete authority over all of the educational units of the University. CUNY is the largest and most diverse urban public university in the United States. It has approximately 230,000 students in degree programs and about the same number in adult and continuing education programs. It is composed of 11 senior colleges, six community colleges, a graduate school, a law school, a school of bio-medical education, a graduate school of journalism, a school of professional studies and an honors college that serves six of the senior colleges. There are ten campuses in Manhattan, three in the Bronx, five in Queens, four in Brooklyn and one in Staten Island.

        4.      During the 1990's and the first years of this decade, each campus had considerable autonomy with respect to its computer systems. Emblematic of the decentralized and uncoordinated nature of CUNY's computer systems was the lack of a University-wide policy. In 1995 CUNY had issued a brief statement on "Computer User Responsibilities" (Exhibit 2), which was never adopted by the Board of Trustees and was not a formal policy. Some, but not all, of the campuses also had rules relating to computer use.

5.    In December 2001 CUNY hired for the first time a Chief Information Officer. The CIO immediately established a CUNY-wide Information Technology Steering Committee, which was charged with the responsibility of identifying and implementing enterprise technology initiatives that would be managed centrally but would benefit each of the campuses. These initiatives included an enterprise a course management system, an academic advisement system and a fundraising software product. In addition, the Committee believed that these initiatives should also address common needs in the areas of network solutions, bandwidth, security and administrative systems such as email. Since 2003 all of these areas have, in fact, been addressed. In particular, in 2005 the Standards Subcommittee of the IT Steering Committee established a University-wide set of standards and procedures for administering email for faculty and staff. CUNY is working to implement those standards and procedures. CUNY also hired a computer security officer, who promulgated security guidelines and procedures. CUNY's management practices with respect to email are now consistent with best practices in both the public and private sector.

6.    As part of the effort to develop an integrated approach to computer resources across the University, the Chancellor asked me in the spring of 2004 to convene a task force to develop a policy on computer use. I invited representatives of a number of constituencies to serve on the task force including administrators from the Central Office, College Presidents and faculty. I also appointed a lawyer from the Office of the General Counsel to serve as staff to the task force. Over the summer, she reviewed numerous computer use policies from other colleges and universities and prepared a first draft of a policy based on best practices at those institutions. The first meeting of the task

force was held on September 27, 2004. Over the course of the 2004-05 academic year, the task force met periodically and reviewed and commented on several drafts, which were then revised by the staff attorney under my supervision. During the 2005-06 academic year, the task force continued to work on revising the draft policy. In April 2006, the task force approved a draft, and I distributed it for comments from the wider University community, including the University Faculty Senate, the Administrative Council (composed of the Vice Presidents for Administration and Finance at all of the colleges) and the IT Steering Committees on each campus. My office incorporated a number of those comments into additional drafts during the fall 2006 semester.

6.     By letter dated August 24, 2006, Brenda Malone, CUNY's Vice Chancellor for Faculty and Staff Relations, sent a copy of the current draft of the policy to plaintiff Dr. Barbara Bowen, President of the PSC. At the request of the PSC, Vice Chancellor Malone and I met with Dr. Bowen and other officers of CUNY and the PSC on two occasions during the fall 2006 semester. The PSC representatives communicated their concerns about a number of the provisions in the draft policy; several of those concerns resulted in revisions to the policy in subsequent drafts. One of their requests was that the policy establish the right of the PSC to use the University's computer resources, including the email system, to communicate with its members and otherwise conduct union business. I replied that CUNY was unwilling to include such a provision in the policy but would be willing to consider a demand by the union to that effect in the next round of collective bargaining (which was less than a year away).

7.     The final version of a Policy on Acceptable Use of Computer Resources (the "Policy") (Exhibit 3) was presented to and approved by the Committee on

Faculty, Staff and Administration of the CUNY Board of Trustees on January 8, 2007. A

public hearing was held on January 22, 2007 at which members of the University

community and general public commented on a number of items on the calendar for the

January Board meeting, including the Policy. A resolution approving the Policy was

unanimously adopted by the Board of Trustees at its meeting on January 29, 2007. As

approved, the Policy provides in relevant part as follows:

> **2. Purpose.** Use of CUNY computer resources is limited to activities relating to
> the performance by CUNY employees of their duties and responsibilities. For
> example, use of CUNY computer resources for private commercial or not-for-
> profit business purposes, for private advertising of products or services, or for any
> activity meant solely to foster personal gain, is prohibited. Similarly, use of
> CUNY computer resources for partisan political activity is also prohibited.
>
> Except with respect to CUNY employees other than faculty, where a supervisor
> has prohibited it in writing, incidental personal use of computer resources is
> permitted so long as such use does not interfere with CUNY operations, does not
> compromise the functioning of CUNY computer resources, does not interfere
> with the user's employment or other obligations to CUNY, and is otherwise in
> compliance with this policy.

Origins of the Current Dispute

8.      CUNY and the PSC began bargaining for a new contract early in

2007. The PSC presented its demands at a negotiating session on March 2, 2007. They

did not include a demand for access to the University's email system for union business.

During the ensuing negotiations, I suggested to the PSC leadership that if they wanted

such access, they needed to negotiate over it. In a letter dated May 24, 2007 (Exhibit 4),

Vice Chancellor Malone pointed out to Deborah Bell, the PSC's Executive Director, that

collective bargaining was the appropriate forum for dealing with both the union's request

for the email addresses of its members in the bargaining unit and for use of the

University's computer resources. Again, in a letter dated August 28, 2007 (Exhibit 5), Interim Vice Chancellor Gloriana Waters reminded Ms. Bell that the University had advised the union that it should raise both of these matters in collective bargaining and that it had failed to do so.

9.    In October 2007 I called Ms. Bell and asked her if the PSC intended to amend its collective bargaining demands to include the use of CUNY's computer resources. I explained that I had received information from President Gail Mellow that the PSC Chapter Chair at LaGuardia Community College was using the email system to send out notices of meetings, and that this conduct violated the Policy. I stated that I would defer any action with respect to this violation if the PSC intended to bargain over this matter, but that I was not willing to delay too long because I was concerned that the union would argue that CUNY had acquiesced in such use. About a week later, Ms. Bell called and informed me that the PSC did not intend to add a demand on this subject in collective bargaining. When I asked for the reason, she replied that the PSC wanted CUNY to permit its use of the University's email system without having to bargain for it. I replied that the University did not intend to grant such permission except in the context of the collective bargaining process.

10.    Thereafter, I had further communications with President Mellow, who, at my request, sent an email dated October 30, 2007 (Exhibit 6) informing Plaintiff Lorraine Cohen, the campus Chapter Chair of the PSC, that by using the University's email system to conduct union business, she had violated the Policy and requesting that she desist. In a letter dated November 15, 2007 (Exhibit 7), Ms. Bell demanded that President Mellow rescind the contents of her letter to Professor Cohen. By letter dated

November 30, 2007 (Exhibit 8), I responded to that letter. Finally, on December 4, 2007, I sent an email message to Professor Cohen, with a copy to Ms. Bell, informing her that if she continued to use the University's email system to conduct union business, in violation of the Policy, her email privileges would be suspended pursuant to Section 14 of the Policy (Exhibit 9). The specific emails sent by Professor Cohen, to which I referred in my email message to her, are attached as Exhibit 10. Each gives notice of a PSC meeting – one by attaching a printed notice, one through an email message composed by Professor Cohen, and one by forwarding an email from Dr. Bowen.

Plaintiff's Spurious First Amendment Claims

11.     Plaintiffs begin their legal analysis by suggesting that Defendants' actions are interfering with the PSC's ability to represent its members. This argument is irrelevant to their First Amendment claims. The First Amendment does not require a public employer to provide the union representing its employees with the best possible means of communication. The PSC already has access to certain University facilities pursuant to the Collective Bargaining Agreement. It is true, no doubt, that email is a more efficient and convenient means of communication than meetings, mail service or bulletin boards. However, access to an email system is hardly critical to the functioning of a union. The PSC has operated effectively for the last 35 years without it. To the best of my knowledge, LaGuardia Community College is the only CUNY campus where the PSC uses the email system to conduct its business. Similarly, from telephone conversations I have had with City officials, it appears that none of the public employee unions representing City workers are permitted to use their agency's email systems to

conduct union business.  In any event, if the PSC really thinks that access to the
University's email system is important, it can seek it through collective bargaining.  So
far it has refused to do that.

       12.     Contrary to Plaintiff's assertions, CUNY's email system is not a
public forum of any sort.  Rather, it is a component of the University's proprietary
computer resources intended for use by its employees for the purpose of performing their
duties and responsibilities as employees.  CUNY's decision to restrict its use to that
purpose (with a limited exception for incidental personal use) does not infringe on the
First Amendment rights of its employees.  Plaintiffs cite no case to the contrary.

       13.     Plaintiffs attempt to make much of the fact that for some years it
apparently did use the email system of LaGuardia Community College to conduct union
business.  This hardly establishes a constitutional right to continue to do so.  For a
number of years, CUNY had no formal policy governing computer use, and the colleges
were left largely to their own devices.  Some had written guidelines; others did not.  The
guidelines of LaGuardia Community College permitted use on one forum solely for
College business and on another forum for personal items, such a birth and death notices,
retirement parties, home sales, tickets to sporting events, and personal greetings.  The
College does not appear to have strictly enforced those guidelines.  The union appears to
haves taken advantage of the lax enforcement by violating the guidelines.  It utilized the
forum created for College business use, which contains a feature allowing emails to all
faculty and staff,  to conduct union business.  In January 2007, however, the Board of
Trustees, the governing body of the University, exercised its authority by adopting the
Policy on Acceptable Use of Computer Resources.  Nothing that happened prior to that

official action has any bearing on this matter. First Amendment rights cannot be created by adverse possession.

14.     Plaintiffs also attempt to characterize this case as one concerning censorship of speech based on point of view and suppression of free expression. This is a complete fabrication. President Mellow and I responded to a situation where a PSC Chapter Chair was using the email system to conduct union business. This was a flagrant violation of the Policy's explicit ban on the use of CUNY's computer resources for private not-for-profit business purposes. (Indeed, Professor Cohen now admits that she has used the email system not only to post notices of union meetings, but also to conduct grievance counseling and process grievances.) However, neither the College nor the University has done or said anything to interfere with the free expression of views by its faculty and staff about any issue, including the terms and conditions of their employment, regardless of whether those views favor the College or the University, the PSC, or someone else. Plaintiffs point to certain email messages that are critical of the leadership of the PSC as to which CUNY has taken no action. That is hardly proof of viewpoint discrimination. I can assure the Court that there are other email messages that are complimentary of that leadership as to which CUNY has also taken no action. CUNY acted not to favor or suppress any point of view but to prevent a union official from conducting union business on its email system in violation of the Policy.

15.     Finally, Plaintiffs contend that communication by the PSC with its members constitutes "official business" within the meaning of the CUNY Policy and the LaGurardia Community College guidelines. However, an allegation that CUNY has improperly interpreted and implemented its own policies does not involve a First

Amendment claim over which this Court has jurisdiction. Indeed, under Article 20 of the Collective Bargaining Agreement, Plaintiffs sole remedy for an allegedly arbitrary or discriminatory application of a Board policy is through the grievance procedure set forth therein. Moreover, there is no merit to Plaintiffs' argument. The CUNY Policy does not use the phrase "official business", but rather limits use of its computer resources to "activities relating to the performance by CUNY employees of their duties and responsibilities." This clearly means their duties and responsibilities as CUNY employees, not as representatives of the PSC or some other organization or business entity. Furthermore, the Policy explicitly prohibits use of the University's computer resources for private not-for-profit business purposes. Similarly, the language relating to "business use" in the LaGuardia Community College guidelines clearly means College business. The campus Chapter Chair of the PSC has clearly violated both the University's Policy and the College's guidelines.

WHEREFORE, I respectfully request that this Court deny Plaintiffs' motion for a preliminary injunction.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Frederick P. Schaffer

Frederick P. Schaffer

Dated: December 7, 2007

*Exhibit 1*

THE CITY UNIVERSITY OF NEW YORK

AGREEMENT
between
THE CITY UNIVERSITY
OF NEW YORK
and the
PROFESSIONAL STAFF CONGRESS/CUNY
November 1, 2002 – September 19, 2007

## TABLE OF CONTENTS

Page

I.    **2002-2007 PSC/CUNY Collective Bargaining Agreement**

| | | |
|---|---|---|
| Preamble | | 1 |
| Article 1 | Recognition | 1 |
| Article 2 | CUNY-PSC Relationships | 5 |
| Article 3 | Unit Stability | 7 |
| Article 4 | Check-Off and Agency Shop | 7 |
| Article 5 | Information and Data | 7 |
| Article 6 | Reassigned Time | 8 |
| Article 7 | Organizational Use of Facilities | 8 |
| Article 8 | Non-Discrimination | 9 |
| Article 9 | Appointment and Reappointment | 9 |
| Article 10 | Schedule for Notification of Reappointment and Non-Reappointment | 12 |
| Article 11 | Classification of Titles | 13 |
| Article 12 | Certificate of Continuous Employment | 16 |
| Article 13 | Appointments and Reappointments in the Higher Education Officer (HEO) Series | 17 |
| Article 14 | Leaves and Holidays | 23 |
| Article 15 | Workload | 26 |
| Article 16 | Temporary Disability or Parental Leave | 30 |
| Article 17 | Jury Duty | 32 |
| Article 18 | Professional Evaluation | 32 |
| Article 19 | Personnel Files | 35 |
| Article 20 | Complaint, Grievance and Arbitration Procedure | 36 |
| Article 21 | Disciplinary Actions | 40 |
| Article 22 | Increased Promotional Opportunities | 44 |
| Article 23 | Distinguished Professorship | 45 |
| Article 24 | Salary Schedules | 45 |
| Article 25 | Research, Fellowship, and Scholar Incentive Awards | 66 |
| Article 26 | Welfare Benefits | 70 |
| Article 27 | Retirement | 72 |
| Article 28 | Travel Allowances | 74 |
| Article 29 | Waiver of Tuition Fees | 74 |
| Article 30 | Facilities and Services | 75 |
| Article 31 | Rehiring of Persons who are Discontinued | 76 |
| Article 32 | Discontinuances | 77 |
| Article 33 | Faculty and Staff Development | 77 |
| Article 34 | Medical Series | 79 |
| Article 35 | CUNY Law School | 82 |
| Article 36 | Resident Series | 85 |
| Article 37 | Academic Calendar | 86 |
| Article 38 | Workers' Compensation | 87 |
| Article 39 | Occupational Safety and Health | 87 |

Article 40   No Strike Pledge
Article 41   Legislative Action                               87
Article 42   2002-2007 Financial Provisions                  87
Article 43   Duration                                        88
                                                             88

II.   **Appendices**

Appendix A
Appendix B                                                   89
Appendix C                                                   91
Appendix D                                                   93
                                                             94

III.   **Supplemental Agreement on Continuing Education**
                                                             96

IV.   **Supplemental Agreement on Educational Opportunity Centers**
                                                             101

## ARTICLE 3
## UNIT STABILITY

Any group of employees in the present collective negotiation unit whose group classification is changed during the life of this Agreement will remain in the unit for the duration of this Agreement.

## ARTICLE 4
## CHECK-OFF AND AGENCY SHOP

**4.1     Check-Off:**
The University agrees to the principle of exclusive check-off of annual PSC dues in amounts to be determined by the PSC in accordance with the forms and procedures approved by the Comptroller's Office of the City of New York or State of New York. Withholding authorizations will be submitted to the appropriate University authorities. The University, together with the PSC, shall develop procedures in conjunction with the Comptroller's Office to expedite the deduction of dues and the prompt remission of same to the PSC. When a member on dues deduction is transferred from one unit of the University to another, authorization to withhold dues shall be forwarded to the new payroll office.

**4.2     Agency Shop:**
The University and the PSC agree that employees covered by this Collective Bargaining Agreement shall be subject to an agency shop fee deduction to the extent permitted by Article Fourteen of the Civil Service Law in accordance with procedures agreed on by the parties.

## ARTICLE 5
## INFORMATION AND DATA

5.1     The University, through the Office of the Vice Chancellor for Faculty and Staff Relations, shall make available to the PSC, upon its reasonable request and within a reasonable time thereafter, such statistics and financial information related to the collective negotiation unit and in possession of the University as are necessary for the implementation of this Agreement and for negotiation of a successor agreement. It is understood that this provision shall not be construed to require the University to compile information and statistics in the form requested if not already compiled in that form, unless mutually agreeable.

5.2     The University shall make available to the PSC:

(a)     Two copies of the proposed Annual University Budget immediately upon its receipt by the Board.

(b)     The name, title, salary, college, department and tenure status of each member of the negotiation unit.  Such data shall be made available once during each Fall and Spring semester.

## ARTICLE 6
## REASSIGNED TIME

6.1     Reassigned time for the handling of grievances and implementation of this Agreement shall be granted:

(a)     to designees of PSC to a maximum aggregate for all campuses (including the Central Office) of 123 classroom contact hours for each semester. 120 hours shall be apportioned amongst the various colleges of The City University of New York with a minimum of 3 hours to be apportioned to each college.

(b)     to an officer of the PSC, full time.

6.2     Any designee under 6.1(a), who is a non-teaching member of the Instructional Staff, may be granted a maximum of one day reassigned time each week from August 30 until the day after the Spring commencement of the academic year. The reassigned time granted to such designee(s) of the PSC during the Spring semester may be continued during the period from the day subsequent to the Spring commencement of the college through August 29 up to a maximum aggregate for all colleges (including the Central Office) of two days of reassigned time each week without further charge. Reassigned time for additional designees during the period from the day subsequent to the Spring commencement until August 29 may be purchased by the PSC in accordance with Section 6.5 below. For purposes of this article, a day of reassigned time shall be the equivalent of six classroom contact hours.

6.3     The names of such PSC designees shall be supplied in writing to the President of each college, with a copy to the Vice Chancellor for Faculty and Staff Relations, no later than prior to the Spring commencement preceding the beginning of the fall semester and no later than two months preceding the beginning of the spring semester for which such reassigned time is sought. No member of the Instructional Staff who is not a full-time employee in this unit may be eligible for such reassigned time.

6.4     Such reassigned time may not be used to solicit PSC membership.

6.5     Consistent with the proper staffing of college and university programs and services, the University will permit the PSC to purchase reassigned time for additional designees. Such reassigned time shall be purchased at the adjunct rate appropriate to the designee. The amount of reassigned time under this paragraph shall be subject to agreement between the parties.

## ARTICLE 7
## ORGANIZATIONAL USE OF FACILITIES

7.1     Upon request to the President or his or her designee, the college chapter of the PSC shall be permitted to meet at the college if appropriate facilities are available.   All requests must be in writing at least three days prior to the requested meeting.

7.2     The PSC shall be permitted to use college mailroom facilities for the distribution of PSC communications.

7.3     At each college campus, the President or his or her designee shall assign two (2) bulletin boards for the exclusive use of the PSC for the purpose of posting PSC notices.  The number of bulletin boards at each college campus shall not exceed eight (8). However, the PSC

shall be entitled to post notices on existing college bulletin boards customarily used for general notices to Instructional Staff, such as in the Faculty Lounge and in the Faculty Dining Room.

## ARTICLE 8
## NON-DISCRIMINATION

8.1    Neither the University nor the Union will interfere with, restrain or coerce the employees covered by this Agreement because of membership in or non-membership in or lawful activity on behalf of the Union. Neither the University nor the Union will discriminate in respect to hire, tenure of employment or any terms or conditions of employment of any employee covered by this Agreement because of sex, race, national origin, religion, sexual orientation, political belief or membership in, or lawful activity on behalf of the Union. The University and the Union shall comply with applicable provisions of federal, state and municipal laws and ordinances regarding discrimination in employment because of age or because of disability.

The City University and the PSC recognize that sexual harassment is illegal under Federal, State, and City law. They jointly resolve that sexual harassment will not be tolerated within the University. The City University will make copies of its policy against sexual harassment available at each College, including the Central Office.

8.2    The Union agrees that it will admit to membership and represent equally all members in the bargaining unit.

## ARTICLE 9
## APPOINTMENT AND REAPPOINTMENT

9.1    When reasonably practicable, initial full-time appointment to the Instructional Staff shall be made, in writing, by the President or his or her designee and approved by the Board prior to the effective date of appointment. Where such written appointment in advance of the effective date is not practicable, appointment shall be made by the President or his or her designee, subject to final action by the Board; in such instances, the President or his or her designee shall advise the appointee, in writing, that the appointment is subject to Board approval.

When a non-tenured or non-certificated member of the instructional staff does not appear at the college to perform his/her duties and fails to receive an authorized leave of absence, the individual shall be considered to have abandoned his/her position, and the college shall have no further obligation to that individual under the following circumstances: for a full-time member of the instructional staff, such abandonment shall be deemed to have occurred after 10 consecutive days of absence, other than Saturdays, Sundays or legal holidays. For an adjunct, such abandonment shall be deemed to have occurred after unauthorized absence from the first week of scheduled classes or other assigned duties. In either case the college shall notify the staff member in writing by certified mail that abandonment of his/her position has occurred.

**ARTICLE 20**
**COMPLAINT, GRIEVANCE AND ARBITRATION PROCEDURE**

20.1    Intent:

The parties agree to use their best efforts to encourage the informal and prompt settlement of complaints and grievances which may arise between the PSC, the employees, and the University.  The orderly processes hereinafter set forth will be the sole method used for the resolution of all complaints and grievances.

20.2    Definitions:

A complaint is an informal claim by an employee in the bargaining unit or by the PSC of improper, unfair, arbitrary or discriminatory treatment.

A complaint may, but need not, constitute a grievance.  Complaints shall be processed through the informal procedure herein set forth.

A grievance is an allegation by an employee or the PSC that there has been:

(1)        a breach, misinterpretation or improper application of a term of this Agreement; or

(2)        an arbitrary or discriminatory application of, or a failure to act pursuant to the Bylaws and written policies of the Board related to the terms and conditions of employment.

20.3    Informal Procedure for Handling Complaints:

Any employee in the bargaining unit may present and discuss his or her complaint either with or without a representative of the PSC.  Similarly, a representative of the PSC may present and discuss a complaint on behalf of any employee or group of employees with the head of the department involved.  This presentation and discussion shall be entirely informal.  Any settlement, withdrawal or disposition of a complaint at this informal stage shall not constitute a binding precedent in the settlement of similar complaints or grievances.

20.4    Formal Procedure for Handling Grievances:

Grievances may be filed by an employee in the bargaining unit on his or her behalf, by the PSC on its behalf, or by the PSC on behalf of any employee or group of employees in the bargaining unit.  Grievances involving employees in more than one College of the University may be filed by the PSC initially at Step 2 of the grievance procedure.

Except in the case of a grievance or arbitration brought by the PSC on its own behalf or on behalf of an employee or a group of employees, no member of this unit may represent another member of this unit at any level of the grievance or arbitration procedure.

A grievance must be filed by an employee or the PSC within thirty (30) days, excluding Saturdays, Sundays and legal holidays, after the PSC or the employee on whose behalf the grievance is filed became aware of the action complained of, except that grievances relating to reappointment or to appointment with a certificate of continuous employment shall be filed within thirty (30) days excluding Saturdays, Sundays, or legal holidays of the individual's scheduled date of notification as specified by Articles 10 and 13 of the Agreement.  Any

grievance or informal complaint not processed in accordance with the time limits specified herein shall be deemed waived by the grievant.

A grievance must be stated in writing setting forth the basis therefor with reasonable particularity, including a designation of the Article of the Agreement, the Section of the Bylaws, or the written policy of the Board relied upon, and the remedy requested.

Step 1.    Grievances shall be filed with the President of the College affected or the President's designee. The President or the designee shall, within fifteen (15) days excluding Saturdays, Sundays, or legal holidays, of the receipt of the grievance, meet with the grievant and a representative of the PSC for the purpose of discussing the grievance. The President or the designee shall, within fifteen (15) days, excluding Saturdays, Sundays, or legal holidays, after the grievance meeting, issue a decision with reasons in writing to the grievant and the PSC.

Step 2.    If the grievance has not been settled at Step 1, then within twenty (20) days, exclusive of Saturdays, Sundays, and legal holidays, after receipt of the written decision of the President of the College or the President's designee, or the expiration of the time limits for making such decision, the grievant or the PSC may submit the grievance in writing to the Chancellor or the Chancellor's designee, together with a copy of the decision of the President of the College affected, or the designee.  The Chancellor or the Chancellor's designee shall, within twenty (20) days, exclusive of Saturdays, Sundays, or legal holidays, of the receipt of the grievance, meet with the grievant and a representative of the PSC for the purpose of discussing the grievance.  In the event the Step I decision was not received by the PSC at least fifteen (15) calendar days prior to the scheduled Step 2 meeting, the Chancellor or his/her designee shall, upon request by the PSC, direct the College to present its arguments first at the Step 2 meeting and shall grant the PSC, upon its request, an adjournment of no greater than fifteen (15) calendar days for the presentation of the grievance at Step 2.  It is understood that nothing herein shifts the burden of proof with respect to the allegations contained in the grievance.  The Chancellor or the designee shall, within twenty (20) days, exclusive of Saturdays, Sundays, or legal holidays, after the grievance meeting, mail the disposition with reasons in writing to the PSC and to the grievant or grievants affected by certified mail, return receipt requested.

Step 3.    If the grievance has not earlier been settled, or if the Chancellor's disposition has not been issued within the time limits above set forth, the person or persons who submitted the grievance at Step 2 may appeal the Step 2 decision to arbitration by serving written notice to that effect by certified mail, return receipt requested, directed to the Chancellor or the Chancellor's designee and to the American Arbitration Association (hereinafter "AAA") within twenty (20) days, exclusive of Saturdays, Sundays, or legal holidays, after mailing of the Step 2 decision, or the last date for the mailing thereof.    Arbitration shall be conducted in accordance with the rules of the American Arbitration Association and the laws of the State of New York, subject to the provisions of paragraph 20.5 hereof.  Legal holidays referred to above shall be those holidays so designated by the State of New York.

20.5    Special Arbitration Provisions:

(a)    The parties hereby designate such arbitrators as shall be mutually agreed upon by the parties during the life of this Agreement, as Members of the Arbitration Tribunal Panel under the Agreement.  The American Arbitration Association shall designate individual Arbitrators, who are Members of the Arbitration Tribunal Panel, to serve in particular cases

submitted to arbitration in accordance with this Section. The designation and initial scheduling of such cases shall be in accordance with the following procedure:

shall be the Administrative Chairperson of the Arbitration Tribunal Panel. The Chairperson shall review all requests for arbitration, together with the grievances in Step 1 and Step 2 and the responses related thereto, and shall, in his or her discretion, determine and direct the American Arbitration Association in respect of the assignment and initial scheduling of particular cases for hearing before himself or herself or any other single Member of the Panel. The Member of the Panel so designated shall be the sole Arbitrator for such case. In connection with said scheduling and assignment, the Chairperson may require consultation with parties' representatives as to the nature of the issues and relief sought and as to other matters related to the assignment or initial scheduling of cases for hearing. The Chairperson may issue a Memorandum of such consultation for the guidance of the parties, the American Arbitration Association, and the designated Arbitrator, it being understood that the Chairperson shall make no determination as to any issue of arbitrability or as to any other issue in the case, unless and until he or she is the assigned Arbitrator, and that the said Memorandum shall not constitute an Award nor be binding upon the designated Arbitrator or the parties. The Arbitrator shall be authorized at any time during the course of the proceedings, on the basis of the proceedings to date, to issue preliminary or interim awards, including awards as to arbitrability, which shall determine the further course of the proceedings.

(b)    For purposes of this sub-paragraph, "academic judgment" shall mean the judgment of academic authorities including faculty, as defined by the Bylaws, and the Board (1) as to the procedures, criteria and information to be used in making determinations as to appointment, reappointment, promotions, and tenure and (2) as to whether to recommend or grant appointment, reappointment, promotions and tenure to a particular individual on the basis of such procedures, criteria and information.    In the arbitration of any grievance or action based in whole or in part upon such academic judgment, the Arbitrator shall not review the merits of the academic judgment or substitute his or her own judgment therefor, provided that the Arbitrator may determine (i) that the action violates a term of this agreement or (ii) that it is not in accordance with the Bylaws or written policies of the Board, or (iii) that the claimed academic judgment in respect of the appointment, reappointment, promotion or tenure of a particular individual in fact constituted an arbitrary or discriminatory application of the Bylaws or written policies of the Board.

(c)  (1)    In cases involving the failure to appoint, promote or reappoint an employee in which the Arbitrator sustains the grievance, except as specifically provided by sub-paragraph (d) below, the Arbitrator shall not, in any case, direct that a promotion, appointment or reappointment with or without tenure be made, but upon his or her finding that there is a likelihood that a fair academic judgment may not be made on remand if normal academic procedures are followed, the Arbitrator shall remand the matter to a select faculty committee of three tenured full or associate professors of The City University of New York, to be selected from a panel jointly chosen by the Chancellor and the President of the PSC of, when possible, 100 tenured full or associate professors, or in a case involving members of the non-classroom instructional staff, from a panel of, when possible, 40 Higher Education Officers, Higher Education Associates, Registrars, Associate Registrars, Chief CLTs and Senior CLTs. The composition of the said panel shall be subject to review and/or replacement annually.

The selection of the members of a select faculty committee shall be made in the following manner: The Chancellor shall submit to the PSC the names of 4 persons from the panel established pursuant to paragraph 20.5.c.1 to serve on the committee. The PSC may reject

one name. In the event the PSC does not reject one name the Chancellor shall select the 3 persons to serve on the committee.

The committee to whom such remand is made for the making of the academic judgment shall (1) have access to the same materials to which the College President had access with respect to the action from which the grievance arose, except as modified by the arbitrator's award, (2) shall meet to deliberate on the assigned case, (3) be subject to the regular rules of confidentiality of faculty proceedings, and (4) shall be constituted within a reasonable time after the Arbitrator's Award is rendered and shall render its decision within twenty (20) days thereafter. The authority of the committee is limited to rendering the academic judgment on the action from which the grievance arose. The committee recommendation shall be in conformity with the Bylaws and policies of the Board and with the Agreement. The recommendation of the committee shall be in the form:

> "The committee recommends (does not recommend)
> (a) appointment, (b) reappointment or (c) promotion"

The committee shall not make recommendations as to any other matter, including but not limited to period of employment or compensation or other benefit of employment.

On receipt of a positive decision which conforms with this Agreement, the Chancellor shall recommend approval of the select committee decision to the Board of Trustees. In the event that the committee decision does not conform with the Agreement, the committee shall be disbanded and a new committee established. The deliberations and decision of the select committee shall not be grievable.

(2)    In cases which arise from actions on reappointment with tenure or a CCE or promotion, the grievant who has been awarded retroactive tenure, CCE or promotion as a result of the recommendation of a select faculty committee adopted by The Board shall receive the salary exclusive of fringe benefits which would have been payable from the effective date of the tenure, CCE or promotion less any amounts earned and other legal offsets attributable to the period between the date of tenure, CCE or promotion and the effective date of the implementation of the remedy.

In cases which arise from actions on reappointment for a prescribed period of time, and the grievant is reappointed as a result of the recommendation of a select faculty committee adopted by The Board, the sole remedy shall consist of reappointment for a prospective equivalent period of time.

Grievances which arise from action on reappointments with tenure, CCE, Certificate of Continual Administrative Service or promotion shall be given priority in processing in the grievance procedure including scheduling for arbitration.

(d) (1)    In cases involving the failure to reappoint an employee in which the arbitrator sustains the grievance upon a finding of a failure to comply with, or an arbitrary or discriminatory application of, procedures such that no academic judgment could have been made with respect to the reappointment of such employee, and a further period of service is necessary to correct the failure to comply with, or the arbitrary or discriminatory use of, procedure, the arbitrator may recommend the prospective reappointment of such employee for a period not to exceed one academic year. The Board shall appoint the employee in accordance with the arbitrator's recommendation. In no event shall such reappointment

confer or result in the granting of tenure, a certificate of continuous employment, or a multiple-year appointment.

(2)     If an employee who has been appointed upon an arbitrator's recommendation is thereafter reappointed pursuant to established procedures for the next academic year in a tenure or certificate-bearing title, or in a multiple-year reappointment situation, the service pursuant to the appointment recommended by the arbitrator shall be counted as service toward tenure or a certificate of continuous employment, or a multiple-year appointment, as the case may be.

20.6     In no event shall the Arbitrator have authority to add to, subtract from, modify or amend the provisions of this Agreement or the Bylaws of the Board.  Such decision or award shall be binding upon the PSC, the University and the employees affected thereby. The costs of arbitration shall be borne equally by the parties.  When arbitrations are not initiated by the PSC, the American Arbitration Association shall require the employee or employees submitting the same to file with the Association adequate security to pay the cost of arbitration.  Expenses for witnesses, however, shall be borne by the party who calls them.

20.7     The University and the PSC will establish a PSC/management committee to study ways to make the grievance procedure more efficient.   The committee will make recommendations to the Chancellor and to the President of the PSC by December 31, 1999. The recommendations shall be advisory.   Any recommendations with which both the Chancellor and the President of the PSC agree, may be implemented during the term of this agreement.

20.8     A grievance filed by the PSC pursuant to this article may be resolved by settlement only if agreed to in writing by the Office of Faculty and Staff Relations and by the PSC Central Office.

## ARTICLE 21
## DISCIPLINARY ACTIONS

21.1     Members of the Instructional Staff may be disciplined by removal, suspension with or without pay, or any lesser form of discipline for one or more of the following reasons, except that staff in HEO series titles shall be subject to discharge as provided in Article 21.9, and Adjuncts shall be subject to discharge as provided in Article 21.11:

      (a)      Incompetent or inefficient service;

      (b)      Neglect of duty;

      (c)      Physical or mental incapacity;

      (d)      Conduct unbecoming a member of the staff.  This provision shall not be interpreted so as to constitute interference with academic freedom.

21.2     Disciplinary proceedings shall be initiated by the President of the college by the service of a written notice of intent to prefer charges upon the employee, which shall set forth:

      (a)      the proposed charges against the employee, and

      (b)      the proposed penalty.

*Exhibit 2*

# The City University of New York
# Computer User Responsibilities

**NOTE:** The City University of New York Computer User Responsibilities is a statement originally prepared by the University's Computer Policy Committee. It underwent review by the University Faculty Senate and the CUNY Office of the Vice Chancellor for Legal Affairs.

The computer resources** of The City University of New York must be used in a manner that is consistent with the University's educational purposes and environment. All users of computer resources are expected to act in a spirit of mutual respect and cooperation, and to adhere to the regulations for their use set forth in this document. As a user of CUNY computer resources:

- You must have a valid authorized account to use computer resources that require one and may use only those computer resources that are specifically authorized. You may use your account only in accordance with its authorized purposes and may not use an unauthorized account for any purpose.

- You are responsible for the safeguarding of your computer account. For a mainframe computer account, you should change your password frequently and should not disclose it to anyone. You should take all necessary precautions in protecting the account, no matter what type of computer resources you are using.

- You may not circumvent system protection facilities.

- You may not knowingly use any system to produce system failure or degraded performance.

- You may not engage in unauthorized duplication, alteration or destruction of data, programs or software. You may not transmit or disclose data, programs or software belonging to others and may not duplicate copyrighted material.

- You may not engage in abusive or improper use of computer hardware. This includes, but is not limited to, tampering with equipment, unauthorized attempts at repairing equipment and unauthorized removal of equipment components.

- You may not use computer resources for private purposes, including, but not limited to, the use of computer resources for profitmaking or illegal purposes.

- You may not use computer resources to engage in abuse of computer personnel or

other users. Such abuse includes the sending of abusive, anonymous, or unsolicited messages within CUNY or beyond via network facilities.

- The use of college computer resources may be subject to college regulations, and you are expected to be familiar with those regulations.

- These regulations and college regulations are subject to revision. You are expected to be familiar with any revisions in regulations.

The University reserves the right to monitor, under appropriate conditions, all data contained in the system to protect the integrity of the system and to insure compliance with regulations.

- Any user who is found to be in violation of these rules shall be subject to the following:

- Suspension and/or termination of computer privileges;

- Disciplinary action by appropriate college and/or University officials;

- Referral to law enforcement authorities for criminal prosecution;

- Other legal action, including action to recover civil damages and penalties.

\*\* "Computer Resources" is an inclusive term referring to any and all computing/information technology: hardware, software and access. Hardware includes, but is not limited to, terminals, personal computers, workstations, printers, mice, monitors, cabling, peripheral devices. Software includes, but is not limited to, mainframe shared software, networked software, and stand-alone software residing on personal computers. Access includes, but is not limited to, accounts on timesharing systems as well as access to stand-alone personal computing systems and other relevant technology.

Revised 1/95

This statement is also available on CUNYVM as a file: ETHICS POLICY Y. If you have any questions about the statement please contact the CUNY Help Desk at 212-541-0981 or via e-mail: ctrcu@cunyvm.cuny.edu.

<u>Top of Page</u>

The City University of New York

Last Updated: 11/20/02

*Exhibit 3*

**Appendix I**

**The City University of New York**

**Policy on Acceptable Use of Computer Resources**

# Introduction

CUNY's computer resources are dedicated to the support of the university's mission of education, research and public service. In furtherance of this mission, CUNY respects, upholds and endeavors to safeguard the principles of academic freedom, freedom of expression and freedom of inquiry.

CUNY recognizes that there is a concern among the university community that because information created, used, transmitted or stored in electronic form is by its nature susceptible to disclosure, invasion, loss, and similar risks, electronic communications and transactions will be particularly vulnerable to infringements of academic freedom. CUNY's commitment to the principles of academic freedom and freedom of expression includes electronic information. Therefore, whenever possible, CUNY will resolve doubts about the need to access CUNY computer resources in favor of a user's privacy interest.

However, the use of CUNY computer resources, including for electronic transactions and communications, like the use of other university-provided resources and activities, is subject to the requirements of legal and ethical behavior. This policy is intended to support the free exchange of ideas among members of the CUNY community and between the CUNY community and other communities, while recognizing the responsibilities and limitations associated with such exchange.

# Applicability

This policy applies to all users of CUNY computer resources, whether affiliated with CUNY or not, and whether accessing those resources on a CUNY campus or remotely.

This policy supersedes the CUNY policy titled "CUNY Computer User Responsibilities" and any college policies that are inconsistent with this policy.

# Definitions

"CUNY Computer resources" refers to all computer and information technology hardware, software, data, access and other resources owned, operated, or contracted by CUNY. This includes, but is not limited to, personal computers, handheld devices, workstations, mainframes, minicomputers, servers, network facilities, databases, memory, and associated peripherals and software, and the applications they support, such as e-mail and access to the internet.

"E-mail" includes point-to-point messages, postings to newsgroups and listservs, and other electronic messages involving computers and computer networks.

### Rules for Use of CUNY Computer Resources

**1. Authorization.** Users may not access a CUNY computer resource without authorization or use it for purposes beyond the scope of authorization. This includes attempting to circumvent CUNY computer

resource system protection facilities by hacking, cracking or similar activities, accessing or using another person's computer account, and allowing another person to access or use the user's account. This provision shall not prevent a user from authorizing a colleague or clerical assistant to access information under the user's account on the user's behalf while away from a CUNY campus or because of a disability. CUNY computer resources may not be used to gain unauthorized access to another computer system within or outside of CUNY. Users are responsible for all actions performed from their computer account that they permitted or failed to prevent by taking ordinary security precautions.

**2. Purpose.** Use of CUNY computer resources is limited to activities relating to the performance by CUNY employees of their duties and responsibilities. For example, use of CUNY computer resources for private commercial or not-for-profit business purposes, for private advertising of products or services, or for any activity meant solely to foster personal gain, is prohibited. Similarly, use of CUNY computer resources for partisan political activity is also prohibited.

Except with respect to CUNY employees other than faculty, where a supervisor has prohibited it in writing, incidental personal use of computer resources is permitted so long as such use does not interfere with CUNY operations, does not compromise the functioning of CUNY computer resources, does not interfere with the user's employment or other obligations to CUNY, and is otherwise in compliance with this policy.

**3. Compliance with Law.** CUNY computer resources may not be used for any purpose or in any manner that violates CUNY rules, regulations or policies, or federal, state or local law. Users who engage in electronic communications with persons in other states or countries or on other systems or networks may also be subject to the laws of those other states and countries, and the rules and policies of those other systems and networks. Users are responsible for ascertaining, understanding, and complying with the laws, rules, policies, contracts, and licenses applicable to their particular use.

Examples of applicable federal and state laws include the laws of libel, obscenity and child pornography, as well as the following:

Family Educational Rights and Privacy Act

Electronic Communications Privacy Act

Computer Fraud and Abuse Act

New York State Freedom of Information Law

New York State Law with respect to the confidentiality of library records

Examples of applicable CUNY rules and policies include the following:

Sexual Harassment Policy

Policy on Maintenance of Public Order

Web Site Privacy Policy

Gramm-Leach-Bliley Information Security Program

University Policy on Academic Integrity

Information Security policies

**4. Licenses and Intellectual Property.** Users of CUNY computer resources may use only legally obtained, licensed data or software and must comply with applicable licenses or other contracts, as well as copyright, trademark and other intellectual property laws.

> Much of what appears on the internet and/or is distributed via electronic communication is protected by copyright law, regardless of whether the copyright is expressly noted. Users of CUNY computer resources should generally assume that material is copyrighted unless they know otherwise, and not copy, download or distribute copyrighted material without permission unless the use does not exceed fair use as defined by the federal Copyright Act of 1976. Protected material may include, among other things, text, photographs, audio, video, graphic illustrations, and computer software.

**5. False Identity and Harassment.** Users of CUNY computer resources may not employ a false identity, mask the identity of an account or computer, or use computer resources to engage in abuse of others, such as sending harassing, obscene, threatening, abusive, deceptive, or anonymous messages within or outside CUNY.

**6. Confidentiality.** Users of CUNY computer resources may not invade the privacy of others by, among other things, viewing, copying, modifying or destroying data or programs belonging to or containing personal or confidential information about others, without explicit permission to do so. CUNY employees must take precautions to protect the confidentiality of personal or confidential information encountered in the performance of their duties or otherwise.

**7. Integrity of Computer Resources.** Users may not install, use or develop programs intended to infiltrate or damage a computer resource, or which could reasonably be expected to cause, directly or indirectly, excessive strain on any computing facility. This includes, but is not limited to, programs known as computer viruses, Trojan horses, and worms. Users should consult with the IT director at their college before installing any programs that they are not sure are safe.

**8. Disruptive Activities.** CUNY computer resources must not be used in a manner that could reasonably be expected to cause or does cause, directly or indirectly, unwarranted or unsolicited interference with the activity of other users. This provision explicitly prohibits chain letters, virus hoaxes or other intentional e-mail transmissions that disrupt normal e-mail service. Also prohibited are spamming, junk mail or other unsolicited mail that is not related to CUNY business and is sent without a reasonable expectation that the recipient would welcome receiving it, as well as the inclusion on e-mail lists of individuals who have not requested membership on the lists, other than the inclusion of members of the CUNY community on lists related to CUNY business. CUNY has the right to require users of CUNY computer resources to limit or refrain from other specific uses if, in the opinion of the IT director at the user's college, such use interferes with efficient operations of the system, subject to appeal to the President or, in the case of central office staff, to the Chancellor.

**9. CUNY Names and Trademarks.** CUNY names, trademarks and logos belong to the university and are protected by law. Users of CUNY computer resources may not state or imply that they speak on behalf of CUNY or use a CUNY name, trademark or logo without authorization to do so. Affiliation with CUNY does not, by itself, imply authorization to speak on behalf of CUNY.

**10. Security.** CUNY employs various measures to protect the security of its computer resources and of users' accounts. However, CUNY cannot guarantee such security. Users are responsible for engaging in safe computing practices such as guarding and not sharing their passwords, changing passwords regularly, logging out of systems at the end of use, and protecting private information, as well as for following CUNY's Information Security policies and procedures. Users must report incidents of Information Security policy non-compliance or other security incidents to CUNY's Chief Information Officer and Chief Information Security Officer, and the IT director at the affected user's college.

**11. Filtering.** CUNY reserves the right to install spam, virus and spyware filters and similar devices if necessary in the judgment of CUNY's Office of Information Technology or a college IT director to protect the security and integrity of CUNY computer resources. Notwithstanding the foregoing, CUNY will not install filters that restrict access to e-mail, instant messaging, chat rooms or websites based solely on content.

**12. Confidential Research Information.** Principal investigators and others who use CUNY computer resources to store or transmit research information that is required by law or regulation to be held confidential or for which a promise of confidentiality has been given, are responsible for taking steps to protect confidential research information from unauthorized access or modification. In general, this means storing the information on a computer that provides strong access controls (passwords) and encrypting files, documents, and messages for protection against inadvertent or unauthorized disclosure while in storage or in transit over data networks. Robust encryption is strongly recommended for information stored electronically on all computers, especially portable devices such as notebook computers, Personal Digital Assistants (PDAs), and portable data storage (e.g., memory sticks) that are vulnerable to theft or loss, as well as for information transmitted over public networks. Software and protocols used should be reviewed and approved by CUNY's Office of Information Technology.

**13. CUNY Access to Computer Resources.**

CUNY does not routinely monitor, inspect, or disclose individual usage of its computer resources without the user's consent. In most instances, if the university needs information located in a CUNY computer resource, it will simply request it from the author or custodian. However, CUNY IT professionals and staff do regularly monitor general usage patterns as part of normal system operations and maintenance and might, in connection with these duties, observe the contents of web sites, e-mail or other electronic communications. Except as provided in this policy or by law, these individuals are not permitted to seek out contents or transactional information, or disclose or otherwise use what they have observed. Nevertheless, because of the inherent vulnerability of computer technology to unauthorized intrusions, users have no guarantee of privacy during any use of CUNY computer resources or in any data in them, whether or not a password or other entry identification or encryption is used. Users may expect that the privacy of their electronic communications and of any materials contained in computer storage in any CUNY electronic device dedicated to their use will not be intruded upon by CUNY except as outlined in this policy.

CUNY may specifically monitor or inspect the activity and accounts of individual users of CUNY computer resources, including individual login sessions, e-mail and other communications, without notice, in the following circumstances:

    a. when the user has voluntarily made them accessible to the public, as by posting to Usenet or a web page;

    b. when it is reasonably necessary to do so to protect the integrity, security, or functionality

of CUNY or other computer resources, as determined by the college chief information officer or his or her designee, after consultation with CUNY's chief information officer or his or her designee;

c. when it is reasonably necessary to diagnose and resolve technical problems involving system hardware, software, or communications, as determined by the college chief information officer or his or her designee, after consultation with CUNY's chief information officer or his or her designee;

d. when it is reasonably necessary to protect CUNY from liability, or when failure to act might result in significant bodily harm, significant property loss or damage, or loss of significant evidence, as determined by the college president or a vice president designated by the president, after consultation with the Office of General Counsel and the Chair of the University Faculty Senate (if a CUNY faculty member's account or activity is involved) or Vice Chair if the Chair is unavailable;

e. when there is a reasonable basis to believe that CUNY policy or federal, state or local law has been or is being violated, as determined by the college president or a vice president designated by the president, after consultation with the Office of General Counsel and the Chair of the University Faculty Senate (if a CUNY faculty member's account or activity is involved) or Vice Chair if the Chair is unavailable;

f. when an account appears to be engaged in unusual or unusually excessive activity, as indicated by the monitoring of general activity and usage patterns, as determined by the college president or a vice president designated by the president and the college chief information officer or his or her designee, after consultation with CUNY's chief information officer or his or her designee, the Office of General Counsel, and the Chair of the University Faculty Senate (if a CUNY faculty member's account or activity is involved) or Vice Chair if the Chair is unavailable; or

g. as otherwise required by law.

In those situations in which the Chair of the University Faculty Senate is to be consulted prior to monitoring or inspecting an account or activity, the following procedures shall apply: (i) the college president shall report the completion of the monitoring or inspection to the Chair and the CUNY employee affected, who shall also be told the reason for the monitoring or inspection, except where specifically forbidden by law; and (ii) if the monitoring or inspection of an account or activity requires physical entry into a faculty member's office, the faculty member shall be advised prior thereto and shall be permitted to be present to observe, except where specifically forbidden by law.

A CUNY employee may apply to the General Counsel for an exemption from some or all of the circumstances under which CUNY may inspect and monitor computer resource activity and accounts, pursuant to subparagraphs (a)-(f) above, with respect to a CUNY computer resource used solely for the collection, examination, analysis, transmission or storage of confidential research data. In considering such application, the General Counsel shall have the right to require the employee to affirm in writing that the computer resource will be used solely for the confidential research. Any application for exemption should be made prior to using the computer resource for the confidential research.

CUNY, in its discretion, may disclose the results of any general or individual monitoring or inspection to appropriate CUNY personnel or agents, or law enforcement or other agencies. The results may be used in college disciplinary proceedings, discovery proceedings in legal actions, or otherwise as is necessary to protect the interests of the University.

In addition, users should be aware that CUNY may be required to disclose to the public under the New York State Freedom of Information Law communications made by means of CUNY computer resources in conjunction with University business.

Any disclosures of activity of accounts of individual users to persons or entities outside of CUNY, whether discretionary or required by law, shall be approved by the General Counsel and shall be conducted in accordance with any applicable law. Except where specifically forbidden by law, CUNY employees subject to such disclosures shall be informed promptly after the disclosure of the actions taken and the reasons for them.

The Office of General Counsel shall issue an annual statement of the instances of account monitoring or inspection that fall within categories (d) through (g) above. The statement shall indicate the number of such instances and the cause and result of each. No personally identifiable data shall be included in this statement.

See CUNY's Web Site Privacy Policy for additional information regarding data collected by CUNY from visitors to the CUNY website at www.cuny.edu.

**14. Enforcement.** Violation of this policy may result in suspension or termination of an individual's right of access to CUNY computer resources, disciplinary action by appropriate CUNY authorities, referral to law enforcement authorities for criminal prosecution, or other legal action, including action to recover civil damages and penalties.

Violations will normally be handled through the university disciplinary procedures applicable to the relevant user. For example, alleged violations by students will normally be investigated, and any penalties or other discipline will normally be imposed, by the Office of Student Affairs.

CUNY has the right to temporarily suspend computer use privileges and to remove from CUNY computer resources material it believes violates this policy, pending the outcome of an investigation of misuse or finding of violation. This power may be exercised only by the President of each college or the Chancellor.

**15. Additional Rules.** Additional rules, policies, guidelines and/or restrictions may be in effect for specific computers, systems, or networks, or at specific computer facilities at the discretion of the directors of those facilities. Any such rules which potentially limit the privacy or confidentiality of electronic communications or information contained in or delivered by or over CUNY computer resources will be subject to the substantive and procedural safeguards provided by this policy.

**16. Disclaimer.** CUNY shall not be responsible for any damages, costs or other liabilities of any nature whatsoever with regard to the use of CUNY computer resources. This includes, but is not limited to, damages caused by unauthorized access to CUNY computer resources, data loss, or other damages resulting from delays, non-deliveries, or service interruptions, whether or not resulting from circumstances under the CUNY's control.

Users receive and use information obtained through CUNY computer resources at their own risk.

CUNY makes no warranties (expressed or implied) with respect to the use of CUNY computer resources. CUNY accepts no responsibility for the content of web pages or graphics that are linked from CUNY web pages, for any advice or information received by a user through use of CUNY computer resources, or for any costs or charges incurred by a user as a result of seeking or accepting such advice or information.

CUNY reserves the right to change this policy and other related policies at any time. CUNY reserves any rights and remedies that it may have under any applicable law, rule or regulation. Nothing contained in this policy will in any way act as a waiver of such rights and remedies.

Last Updated: 2/8/07

*Exhibit 4*


The City
University
of
New York

**Office of the Vice Chancellor for
Faculty and Staff Relations**
535 East 80th Street
New York, NY 10021
Tel: 212-794-5353
Fax: 212-794-5667



May 24, 2007

Ms. Deborah E. Bell
Executive Director
Professional Staff Congress/CUNY
61 Broadway  Suite 1500
New York, New York  10006

Dear Ms. Bell:

I write in response to your letter of May 18, 2007 in which you ask for a formal response to your request for the e-mail addresses of all members of the PSC bargaining unit.

Article 5 of the 2002-2007 PSC/CUNY collective bargaining agreement sets forth the parties' negotiated agreement with respect to the union's access to University data. It does not include disclosure of e-mail addresses. Nor is the University required to provide e-mail addresses under the holding or reasoning of the ALJ's decision in the *Town of Greenburgh* case.

The University and the PSC are currently at the bargaining table to negotiate an agreement to succeed the agreement that expires on September 19, 2007.  That is the appropriate forum for discussing an expansion of the union's access to University data, as well as the union's use of the University's computer resources.

Sincerely,

Brenda R. Malone
Vice Chancellor

c:      Senior Vice Chancellor Frederick P. Schaffer
        Raymond F. O'Brien, Esq.
        PSC President Barbara Bowen

*Exhibit 5*



The City
University
of
New York

**Office of the Vice Chancellor for
Faculty and Staff Relations**
535 East 80th Street
New York, NY 10075
Tel: 212-794-5353
Fax: 212-794-5667

A 10: 42

UNIVERSITY
YORK
COUNSEL

August 28, 2007

Ms. Deborah E. Bell
Executive Director
Professional Staff Congress/CUNY
61 Broadway  Suite 1500
New York, New York  10006

Dear Ms. Bell:

I write in response to your letter of August 15, 2007 in which you ask the University to reconsider its position regarding the PSC's request for the e-mail addresses of all members of the PSC bargaining unit.  On May 24, 2007, Vice Chancellor Brenda R. Malone responded to your May 18, 2007 letter in which you requested these e-mail addresses.  In her letter, she noted that the union's access to University data, negotiated by the parties and incorporated into Article 5 of the collective bargaining agreement, does not include access to employees' e-mail addresses, that the case law does not support the union's contention that the Taylor Law requires the University to provide e-mail addresses, and that the appropriate forum for the union to raise this demand is the bargaining table.

The parties are currently in negotiations for an agreement to succeed the 2002-2007 collective bargaining agreement.  Despite Vice Chancellor's Malone's invitation to the union to raise this demand in the bargaining, the union to date has not done so.  The University continues to believe that the bargaining table is the proper forum in which the union should raise this demand.  The merits of the reasons for the demand, articulated in your August 15 letter, may be discussed in the negotiations, should the union choose to pursue it.

In related matter, the PSC had requested that the University permit it to use the University's e-mail system to communicate with its members about union business.  The University had advised the union that it should raise the matter in collective bargaining.  To date the union has not done so.

Sincerely,

Gloriana B. Waters
Interim Vice Chancellor

c:    Senior Vice Chancellor Frederick P. Schaffer
      Raymond F. O'Brien, Esq.
      PSC President Barbara Bowen



*Exhibit 6*

October 30, 2007

PSC Chapter Chair
LaGuardia Community College

Dear Professor Cohen:

This fall you sent several notices relating to PSC meetings via the
email system of LaGuardia Community College. I have asked the
University's General Counsel about this, and he has informed me that
such use of the University's computer resources violates the Policy on
Acceptable Use of Computer Resources adopted by the Board of Trustees
on
January 29, 2007. That Policy provides in relevant part: "Use of CUNY
computer resources is limited to activities relating to the performance
by CUNY employees of their duties and responsibilites." Union business
is not part of the performance of an employee's duties and
responsibilities. Accordingly, I am writing to request that you cease
using the College's email system, or other computer resources, to send
notices of PSC meetings or to carry out other union business.

Sincerely,

Gail O. Mellow
President

cc. Jemme La Caille, Labor Designeee
Vice Chancellor, Frederick Schaffer

*Exhibit 7*

# PSCcuny/ *Professional Staff Congress / City University of New York*

*61 Broadway, Suite 1500 • New York, New York 10006 • 212/354-1252 • Fax 212/302-7815*
**Visit our website at http://www.psc-cuny.org**

**OFFICERS**

**Barbara Bowen**
President

**Steven London**
First Vice President

**Arthurine DeSola**
Secretary

**Michael Fabricant**
Treasurer

**Stanley Aronowitz**
**Jonathan Buchsbaum**
**Lorraine Cohen**
**John Pittman**
**Nancy Romer**
University-wide Officers

**Robert Cermele**
Vice President Senior Colleges

**Kathleen Barker**
**Marilyn Neimark**
**Alex Vitale**
Senior College Officers

**Anne Friedman**
VicePresident
Community Colleges

**Jacob Appleman**
**Lizette Colón**
**Susan O'Malley**
Community College Officers

**Iris DeLutro**
Vice President
Cross Campus Units

**Donna Veronica Gill**
**Steven Trimboli**
**Vera Weekes**
Cross Campus Officers

**Marcia Newfield**
Vice President
Part-Time Personnel

**Susan DiRaimo**
**David Hatchett**
**Diane Menna**
Part-Time College Officers

**Peter Jonas**
**James Perlstein**
Retiree Officers

**Irwin H. Polishook**
President Emeritus

**Israel Kugler**
Deputy President Emeritus

**Peter I. Hoberman**
President Emeritus
Cross Campus Units

**STAFF**

**Deborah E. Bell**
Executive Director

**Mary Ann Carlese**
Associate Executive Director

**Faye H. Alladin**
Coordinator,
Financial Services

**Dorothee Benz**
Coordinator,
Communication

**Debra Bergen**
Director, Contract Administration &
University-wide Grievance Counselor

**Cynthia Campos**
Coordinator, Contract Administration

**Barbara Gabriel**
Coordinator, Office Services &
Human Resource

**Peter Hogness**
Newspaper Editor

**Kate Pfordresher**
Coordinator of Policy & Research

**Diana Rosato**
Coordinator, Membership

**Clarissa Gilbert Weiss**
Director, Pension & Welfare Benefits

November 15, 2007

**Via Email and Hand Delivery**

Dr. Gail O. Mellow, President
LaGuardia Community College
31-10 Thompson Avenue
Long Island City, New York 10101



Dear President Mellow:

I have received a copy of the November 9, 2007 letter from Vice Chancellor Frederick Schaffer to you, which was distributed to the LaGuardia Community College community, but not to the PSC. On behalf of the PSC, I write to respond.

Vice Chancellor Schaffer's letter conflates three distinct issues: LaGuardia Community College's recent foray into blatant censorship, the PSC's access to university facilities, and the PSC's right to the information required to fulfill its responsibility of representing its members at CUNY. Also, Vice Chancellor Schaffer errs in his assertion, "The PSC requested that the [computer use] policy include a provision establishing its right to use the university's email system." I'd like to disentangle these issues and correct the Vice Chancellor's assertions.

The nub of the dispute that now embroils the LaGuardia Community College community is the College's recent attempts to censor PSC-related speech. The university's computer resources and the "everyone" list of LaGuardia's "Groupwise" discussion fora have long been used by PSC members to communicate about union business. It has also been the practice at LaGuardia Community College to use these computer resources to communicate messages on a wide variety of subjects. Your October 30 letter and the Vice Chancellor's November 9 letter make clear that LaGuardia Community College allows the College community to use the "non business chat" forum to discuss numerous topics unrelated to the business of the College, but singles out for exclusion discussion of PSC-related issues and forbids members of the College community to use the non-business chat forum or other College computer resources for discussion of PSC-related matters. By singling out one type of speech for censorship, the College is violating our members' rights under the First Amendment of the United States Constitution and under the New York State Constitution and the Taylor Law.

You and the Vice Chancellor cite and rely upon the University's Policy on Acceptable Computer Use to justify the censorship at LaGuardia. We disagree that the policy adopted by the CUNY Board of Trustees prohibits union use of CUNY computer resources. If the University and the College invoke this policy to single out union-related communication, the University and the College will infringe on bargaining unit members'

American Federation of Teachers Local 2334
New York State United Teachers • New York State AFL-CIO
American Association of University Professors • New York City Central Labor Council



freedom of speech and Taylor Law rights, regardless of whether that infringement is somehow "permissible" under the University's policy.

Contrary to Vice Chancellor Schaffer's assertion, the PSC never asked to bargain over bargaining unit members' right to use the University's computer resources to conduct union business or discuss union-related topics. You need go no further than the PSC's public testimony on the Computer Use Policy before the CUNY Board of Trustees on January 22, 2007 to ascertain the PSC's position on this matter.

Under the collective bargaining agreement between the PSC and CUNY, the PSC has the right of access to various CUNY facilities such as bulletin boards, meeting rooms, and the CUNY internal mail distribution system. These provisions of the contract do not address CUNY's additional obligations under the Taylor Law or employees' constitutional rights to free speech. Thus, these contractual provisions are not relevant to the present dispute.

The final issue referred to by Vice Chancellor Schaffer concerns a dispute between the PSC and CUNY over the union's contention that CUNY provide to the PSC certain email addresses. Under the Taylor Law, the PSC contends it has a legal right to the CUNY-assigned email addresses of all PSC-represented CUNY employees and has made a request for such email addresses. As CUNY has refused to provide these addresses to the PSC, the PSC has filed an improper practice charge at the New York State Public Employment Relations Board ("PERB"). Vice Chancellor Schaffer's letter to you seems to confuse the PSC's legitimate request under the Taylor Law for email addresses with an obligation to bargain. The PSC has not bargained about this issue because it need not bargain about something to which the union believes it has the legal right. In any event, this dispute is being heard by PERB in a hearing that began on November 15, 2007.

While the PSC will not negotiate over the parameters of censorship, PSC and CUNY have traditionally been able to resolve difficult issues by working together. If you are interested in doing so, the first step would be to rescind publicly the policy laid out in your October 30, 2007 letter and return to the status quo ante.

In the interest of fairness, I trust you will share this letter with the LaGuardia Community College community.

I look forward to your prompt reply.

Very truly yours,

Deborah E. Bell
Executive Director

cc: Barbara Bowen; PSC President
    Steve London; PSC First Vice President
    Lorraine Cohen; LaGuardia PSC Chapter Chair
    Frederick Schaffer, Esq.; Vice Chancellor for Legal Affairs
    Gloriana Waters; Interim Vice Chancellor for Faculty and Staff Relations

*Exhibit 8*



The City
University
of
New York

November 30, 2007

Deborah E. Bell
Executive Director
Professional Staff Congress/CUNY
61 Broadway, Suite 1500
New York, New York 10006

Dear Ms. Bell:

       I have received a copy of your letter dated November 15 to President Gail
Mellow of LaGuardia Community College. That letter takes issue with my email
message to President Mellow dated November 9, which was distributed to the LaGuardia
Community College community. It seems appropriate for me to reply to your letter
rather than President Mellow because this is a University-wide issue pertaining to the use
of email at all CUNY campuses.

       You begin by asserting that my email conflates three issues: (1) the
College's alleged attempt to censor PSC-related speech, (2) the PSC's access to
University facilities and (3) the PSC's right to information required to fulfill its
responsibility to represent its members. In fact, as demonstrated below, this dispute has
nothing to do "censorship" nor with the PSC's right to information; it solely concerns the
PSC's access to University facilities.

       Your characterization of the issue as one of censorship is incorrect.
President Mellow's October 30 letter to Lorraine Cohen, the PSC Chapter Chair at
LaGuardia, dealt with the fact that the PSC's elected representative was using the
University's email system to send out notices of meetings and otherwise conduct union
business. It directed Professor Cohen to desist because of the purpose for which she was
using the University's resources, not the content of the communications. It would have
been no different if the situation had been that Professor Cohen was posting union notices
on bulletin boards other than those assigned for the exclusive use of the PSC. There is
nothing in Dr. Mellow's letter or my email that forbids faculty and staff from using the
University's email system to discuss the terms and conditions of their employment or
other "PSC-related matters".

       Next, you contend that contrary to my assertion, the PSC never asked to
bargain over the use of the University's computer resources to conduct union business.
You seem to have misunderstood what I wrote in the email. When the University
consulted with the PSC over the proposed Policy on Acceptable Use of Computer
Resources, the PSC requested that the policy make clear that the University's computer
resources were available to conduct union business. I declined, stating that the matter
should be taken up in collective bargaining, which the PSC has refused to do. Thus, I

agree with your statement that the PSC never asked to bargain over this issue. That is the source of the problem.

Nor is there any merit to your contention that the Taylor Law requires the University to provide the PSC with access to University facilities for the purpose of communicating with its members beyond those already provided under the collective bargaining agreement. The PSC has sufficient facilities for communicating with its members. The Taylor Law does not require more.

Finally, contrary to your assertion, my email made no reference at all to the current dispute over the PSC's demand for the CUNY email addresses of its members. That dispute, however, is another example of the PSC's unfortunate pattern of refusing to bargain about a matter that is the proper subject of collective bargaining and instead running to PERB to try to obtain an advantage to which it is not entitled under the Taylor Law.

Very truly yours,

Frederick P. Schaffer
General Counsel and Senior Vice
Chancellor for Legal Affairs

c:    Gail O. Mellow, LaGuardia Community College President
      Barbara Bowen, PSC President
      Steve London, PSC First Vice President
      Lorraine Cohen, LaGuardia Community College PSC Chapter Chair
      Gloriana Waters, Interim Vice Chancellor for Faculty and Staff Relations

*Exhibit 9*

Frederick P
Schaffer/CENTRALOFFICE/C
UNY

12/04/2007 12:32 PM

To   cohenlo@lagcc.cuny.edu
cc   dbell@pscmail.org
bcc
Subject   Use of University Computer Resources for Union Business

Professor Lorraine I. Cohen
PSC Chapter Chair
LaGuardia Community College

Dear Professor Cohen:

On October 3, 2007 you sent an email over the CUNY email system to faculty and staff at LaGuardia Community College announcing a PSC chapter meeting that afternoon.  On October 22, 2007, you sent another email over the CUNY email system to faculty and staff at LaGuardia Community College announcing a mass meeting of the PSC on October 30.  By letter dated October 30, 2007, President Mellow advised you, at my request, that such use of the University's email system to conduct union business violated the University's Policy on Acceptable Use of Computer Resources and asked you to desist.  You proceeded to ignore that request by using the CUNY email system to send an email on November 20, 2007 to faculty and staff at LaGuardia Community College forwarding a message from Barbara Bowen, President of the PSC, announcing a meeting on December 2 to discuss the union's collective bargaining demand relating to paid parental leave.  Please be advised that if you continue to use CUNY's email system to conduct union business, in violation of the Policy on Acceptable Computer Use of Computer Resources, your email privileges will be suspended pursuant to Section 14 of that policy.

Very truly yours,

Frederick P. Schaffer
General Counsel and Senior Vice Chancellor for Legal Affairs
The City University of New York

*Exhibit 10*

>>> Lorraine I. Cohen 9/27/2007 3:51 PM >>>
Workload is a serious issue for new as well as long time faculty and staff. We
will talk about what we can do together to address this issue.
Lorraine Cohen
PSC Chapter Chair



10-3-07 Chapter Mtg Flyer.doc

# PSCcuny



NYC's higher education union

Professional Staff Congress

## LaGuardia Community College

Please join your colleagues at a

# PSC Chapter Meeting
# Wednesday
# October 3, 2007
# 2:15~4:00 pm
# Rm. E 242

---

### *Building a Union Identity:*
### *Connecting with Other PSC Members*

Organizing for a large turnout for October 30th Mass Meeting

Reaching out to part~time faculty and staff

Local campus issue: Workload

All members are welcome to bring their questions and concerns to the meeting.

---

Light refreshments will be served.

>>> Lorraine I. Cohen 10/22/2007 12:12 PM >>>
"Mass Meeting for a Fair Contract October 30
On Tuesday, October 30, from 6-8:30pm, the PSC will hold a mass meeting
at the Great Hall in Cooper Union. There are two more bargaining
sessions scheduled between now and then, on October 22 and October 29,
but as of today, CUNY management still has not made a financial offer
in
these negotiations-four weeks after our old contract expired. The real
value of our salaries has been eroded by 30 to 45% since the 70s, a
reality that hits home every time we go to pay our bills or find that a
job candidate has turned CUNY down because the salaries are too low-yet
there is no financial offer on the table. Management is demanding an
end
to salary steps, to be replaced by select raises at college
presidents* discretion-yet there is no financial offer on the
table. If this concerns you, alarms you, outrages you, come to the mass
meeting!" PSC website

I want to add my voice as Chapter Chair of the LaGuardia PSC chapter to
urge you to turn out for the mass contract rally at Cooper Union next
Tuesday Oct. 30th. There are so many reasons to attend the rally, not
the least of which is to be with colleagues. Each college will have its
own banner and place to sit. You can sign up on line at the PSC
website,
psc-cuny.org or in person by filling out a sign up sheet being
circulated in your department.

We need to be treated with respect and dignity. We need to challenge
the corporate management style that has come to dominate the way CUNY
deals with its employees. We need decent salaries and benefits.
Lorraine Cohen

>>> Lorraine I. Cohen 11/20/2007 7:00 PM >>>


>>> "Barbara Bowen" <bbowen@pscmail.org> 11/20/2007 3:30 PM >>>
PLEASE FORWARD WIDELY:

The Professional Staff Congress/CUNY has announced that one of the union's
priorities for this round of collective bargaining is achieving paid
family/parental leave.  Faculty and staff from across the University have
been pressing this demand on their campuses, while the bargaining team has
been working hard on it at the negotiating table.  But winning paid parental
leave will be a fight; we need to take the next steps in organizing to
achieve it.

The PSC is calling a meeting of all faculty and staff members interested in
helping to win paid parental/family leave at CUNY--to strategize and
organize together.  All are welcome--whether you have children or not,
whether you are a faculty member who might use the leave or a department
chair who wants to support the leave or a feminist scholar who finds CUNY's
failure to provide the leave outrageous.

Please join parental leave activists from the campuses, members of the union
negotiating team, PSC staff and others in this family-friendly meeting to
develop the next steps in the union campaign to win paid parental leave in
this round of bargaining:

Sunday, December 2
4:30 - 6:00, with refreshments available at 4:00
PSC Union Hall
61 Broadway
212-354-1252
Pizza, soft drinks, healthy drinks and other child-friendly snacks will be
provided
Children of all ages welcome!

PS:  If you haven't yet seen it, take a look at the video clip from the
coverage of this issue at CUNY on NBC television: http://www.psc-
cuny.org/.


Barbara Bowen
President
Professional Staff Congress/CUNY
Phone: 212-354-1252
Fax: 212-302-7815